No. 23-20385

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

DM ARBOR COURT, LIMITED,
*Plaintiff-Appellant,*

v.

THE CITY OF HOUSTON, TEXAS,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Southern District of Texas
No. 4:18-cv-1884
Honorable Keith P. Ellison

---

## OPENING BRIEF FOR PLAINTIFF-APPELLANT

---

Jonathan M. Houghton
Christopher M. Kieser
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Ste. 1000
Arlington, VA 22201
Tel: (916) 419-7111

Aaron M. Streett
Christopher E. Tutunjian
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel: (713) 229-1234

Kenneth B. Chaiken
CHAIKEN & CHAIKEN, P.C.
5717 Legacy Drive, Suite 250
Plano, TX 75024-4246
Tel: (214) 265-0250

*Counsel for Plaintiff-Appellant DM Arbor Court, Ltd.*

## CERTIFICATE OF INTERESTED PERSONS

*DM Arbor Court, Limited v. The City of Houston, Texas*, No. 23-20385

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Baker Botts L.L.P. (Counsel for Plaintiff-Appellant)

- Chaiken, Kenneth B. (Counsel for Plaintiff-Appellant)

- Chaiken & Chaiken, P.C. (Counsel for Plaintiff-Appellant)

- The City of Houston, Texas (Defendant-Appellee)

- DM Arbor Court, Ltd. (Plaintiff-Appellant)

- DM Arbor Court GP (General Partner of Plaintiff Appellant)

- Hickok, Douglas; Cox, Morgan; Carter, Ana Sue; Bobby Altman Trust; Britt, Bobby G.; Hickok, Carter; CKH Family Limited Partnership; Biosca, Elizabeth H.; Forty Acres, Ltd.; Hickok, Kramer; Shook, Leslie; Scharfstein, Lindi Harber; Springer, Margaret Porterfield; Milennium Trust Company LC (Custodian FBO Gene Topolski IRA); Carter, Robert B., Jr.; Blackstone, Ros; Cox, Shiela; Maya, Waldemar D., Jr. (Limited Partners of Plaintiff-Appellant)

- Hightower, Donald B. (Counsel for Defendant-Appellee)

i

- Houghton, Jonathan M. (Counsel for Plaintiff-Appellant)

- Kieser, Christopher M. (Counsel for Plaintiff-Appellant)

- Pacific Legal Foundation (Counsel for Plaintiff-Appellant)

- Soh, Kenneth S. (Counsel for Defendant-Appellee)

- Streett, Aaron M. (Counsel for Plaintiff-Appellant)

- Tutunjian, Christopher E. (Counsel for Plaintiff-Appellant)

Dated: November 22, 2023.                */s/ Jonathan M. Houghton*

*Counsel for Plaintiff-Appellant*
*DM Arbor Court, Ltd.*

## STATEMENT REGARDING ORAL ARGUMENT

Under Fifth Circuit Rule 28.2.3 and Federal Rule of Appellate Procedure 34(a)(1), Plaintiff-Appellant DM Arbor Court, Ltd. submits that the Court would benefit from oral argument. This case raises important questions under the Takings Clause and involves a complex factual record. Accordingly, Plaintiff-Appellant requests oral argument in this case.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................. i

Statement Regarding Oral Argument ...................................................... iii

Table of Authorities ............................................................................ vii

Introduction ......................................................................................... 1

Jurisdictional Statement ........................................................................ 4

Issues Presented ................................................................................... 5

Statement of the Case ........................................................................... 5

    I.     Until these events, Arbor Court was a multi-family, affordable-housing apartment complex. ............................................................. 5

    II.    The City promptly issues repair permits to DMAC after the 2016 Tax Day Flood and explores buying out Arbor Court as a high priority. .......................................................................................... 7

    III.   Arbor Court floods during Hurricane Harvey, and the City briefly intensifies its interest in purchasing Arbor Court. ............................ 9

    IV.   DMAC submits repair permit applications, which undergo a lengthy administrative process. .......................................................... 12

    V.    Unable to finalize a substantial damage determination, the City turns to a previously unused section of Chapter 19 to deny DMAC's permit applications. .......................................................... 13

    VI.   The City's permit denial ended the use of Arbor Court as HUD-subsidized affordable housing. .......................................................... 15

    VII.   The City's actions left Arbor Court with no remaining economically viable use. .......................................................... 17

    VIII.  DMAC files suit, and the district court renders judgment in favor of the City. ............................................................................ 17

Summary of Argument .......................................................................... 19

Standard of Review ................................................................23

Argument .............................................................................24

I.    As the district court recognized, the long-settled framework for regulatory takings applies to the City's actions. .................................24

II.   The permit denial was a categorical taking under *Lucas*. ...................27

    A.    The City's own evidence and the district court's own findings establish that Arbor Court had no economically beneficial use after the City's permit denial. ...........................27

    B.    The ability to hold property for an unknown future use does not defeat a *Lucas* claim. .................................29

    C.    The theoretical possibility of selling the property does not defeat a *Lucas* claim .................................................31

    D.    A factual finding that DMAC failed to rule out any economic use would be clearly erroneous. ................................32

III.  The permit denial also constituted a taking under *Penn Central*. .......36

    A.    DMAC suffered significant economic detriment from the permit denial. .............................................................36

    B.    The permit denial significantly disrupted DMAC's reasonable investment-backed expectations. ...........................37

        1.    The district court found that DMAC's reasonable investment-backed expectations were disrupted, but wrongly blamed the hurricane instead of the City. ........37

        2.    A property owner is not charged with anticipating unexpected events and all possible government responses. ......................................................39

        3.    The City's decision to deny a repair permit—not the hurricane—disrupted DMAC's reasonable investment- backed expectations. ..................................40

        4.    A reasonable property owner would have expected

repair permits or compensation in these circumstances.................................................................42

C.   The character of the permit denial was the functional equivalent of a classic taking. ..................................45

1.   This factor examines the severity of the burden imposed and how that burden is allocated across the public. ..............................................................................46

2.   DMAC alone bore enormous burdens for the public interest and received no benefits. ...................................47

3.   The district court legally erred by focusing on the City's purpose and rationale for its actions. ...................49

IV.   This Court should remand for a determination of just compensation.....................................................................52

Conclusion ........................................................................................53

Certificate of Compliance .................................................................54

Certificate of Service ........................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adolph v. Federal Emergency Management Agency of the United States*, 854 F.2d 732 (5th Cir. 1988)....................................................................26

*Agins v. City of Tiburon*,
447 U.S. 255 (1980)........................................................................................50

*Arete Partners, L.P. v. Gunnerman*,
594 F.3d 390 (5th Cir. 2010) .........................................................................23

*Armstrong v. United States*,
364 U.S. 40 (1960)..........................................................................................49

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021).....................................................................................1

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ...............................................39, 45, 49, 51

*Cienega Gardens v. United States*,
503 F.3d 1266 (Fed. Cir. 2007) ....................................................................48

*Clayland Farm Enterprises, LLC v. Talbot Cnty., Maryland*,
987 F.3d 346 (4th Cir. 2021) ...............................................................46, 48

*Cooley v. United States*,
324 F.3d 1297 (Fed. Cir. 2003) ....................................................................26

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
95 F.3d 1422 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999).................31, 33, 34

*DM Arbor Ct., Ltd. v. City of Houston*,
988 F.3d 215 (5th Cir. 2021) .........................................................................17

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)........................................................................................36

*Florida Rock Indus., Inc. v. United States*,
18 F.3d 1560 (Fed. Cir. 1994) .............................................................43, 46, 48

*Hodel* v. *Irving*,
481 U.S. 704 (1987)........................................................................................46

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) .......................................................................................42

*Houston Expl. Co. v. Halliburton Energy Services, Inc.*,
  359 F.3d 777 (5th Cir. 2004) ...............................................................24

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005)..................................... 24–27, 35, 46, 47, 50, 51

*Lost Tree Village Corp. v. United States*,
  787 F.3d 1111 (Fed. Cir. 2015) ...........................................30, 31, 35

*Lucas v. South Carolina Coastal Council*,
  505 U.S. 1003 (1992)............................... 5, 18–21, 25–32, 34, 35, 43

*MacLeod v. Santa Clara Cnty.*,
  749 F.2d 541 (9th Cir. 1984) ...............................................................30

*Nekrilov v. City of Jersey City*,
  45 F.4th 662 (3d Cir. 2022) .................................................................31

*Penn Central Transportation Co. v. City of New York*,
  438 U.S. 104 (1978)
  ....................................5, 18, 19, 21, 23, 25, 26, 30, 35–37, 40, 45, 46, 48, 51, 52

*Pennsylvania Coal Co. v. Mahon*,
  260 U.S. 393 (1922)..............................................................................24

*Res. Investments, Inc. v. United States*,
  85 Fed. Cl. 447 (2009) .........................................................................26

*Rose Acre Farms, Inc. v. United States*,
  559 F.3d 1260 (Fed. Cir. 2009) .....................................................46, 48

*S. Grande View Dev. Co., Inc. v. City of Alabaster, Alabama*,
  1 F.4th 1299 (11th Cir. 2021) ........................................................44, 46, 47

*San Diego Gas & Elec. Co. v. City of San Diego*,
  450 U.S. 621 (1981) ..............................................................................49

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
  535 U.S. 302 (2002)........................................................................25, 35

*United States v. 320.0 Acres of Land, More or Less in Monroe Cnty.,*
  *State of Fla.*, 605 F.2d 762 (5th Cir. 1979)........................................30

*Vesta Fire Ins. Corp. v. State of Fla.*,
  141 F.3d 1427 (11th Cir. 1998) ...........................................................44

**Constitution**

U.S. Const. amend. V................................................................19, 24, 50

**Statutes**

28 U.S.C. § 1291 ................................................................................4

28 U.S.C. § 1331 ................................................................................4

Houston Code of Ordinances § 19-2....................................................7

Houston Code of Ordinances § 19-11..................................................6

Houston Code of Ordinances § 19-12..................................................6

Houston Code of Ordinances § 19-16(a) .............................................6

Houston Code of Ordinances § 19-19.........................6, 14, 37, 38, 43, 47

Houston Code of Ordinances § 19-19(a) ...........................................14

Houston Code of Ordinances § 19-19(a)(1) .........................................6

Houston Code of Ordinances § 19-32..................................................6

Houston Code of Ordinances § 19-33..................................................6

Houston Code of Ordinances § 19-33(a)(1) .........................................6

**Other Authorities**

Harris County Flood Control District, *Harris County's Flooding History*, https://www.hcfcd.org/About/Harris-Countys-Flooding-History....................................................................................44

## INTRODUCTION

"The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom" because the "protection of property rights is necessary to preserve freedom and empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citation and internal quotation marks omitted). For these reasons, the Founders vigilantly protected property rights through the Fifth Amendment's Takings Clause.

This is a classic takings case, in which the City of Houston ("City") used its regulatory authority to end the use of a valuable property, leaving it idle and with no economically viable use now or at any time in the foreseeable future.

In this matter, DM Arbor Court, Ltd. ("DMAC") sought to continue an economic opportunity, but the City was eager to disrupt the course of DMAC's plans. In 2016, DMAC acquired Arbor Court Apartments ("Arbor Court"), an apartment complex in Houston, Texas, where affordable housing for low-income residents had been located for decades. DMAC invested heavily in the property after being approved by the U.S. Department of Housing and Urban Development ("HUD") as a private investment partner to acquire and operate Arbor Court as affordable housing under a Housing Assistance Payment Contract with HUD.

By all measures, Arbor Court was a success, and DMAC advanced the necessary public-private partnership between the federal government and private investors to provide consistently available, high-quality, and safe housing for those in need, with a reasonable return on investment. After the Tax Day Flood of 2016 that affected most of Houston, the City rejoiced in its joint efforts with DMAC to quickly issue permits allowing for immediate repair of damaged first floor units at the property, so that temporarily displaced residents could return to their Arbor Court homes. For its part, HUD then offered DMAC a rental increase and 20-year extension of its contractual right and obligation to continue providing affordable housing at Arbor Court, notwithstanding any flood risk at the location.

Hurricane Harvey struck Houston and flooded the ground floor units at Arbor Court (and much of the rest of Houston) in 2017. DMAC, HUD, and the residents of Arbor Court all wanted DMAC to make prompt repairs so that displaced residents could quickly return to their homes. With flood insurance proceeds in hand to repair the Harvey-caused damage, DMAC pursued the permits needed to do just that, but the City instead brought Arbor Court's beneficial use to an end by denying its permits in reliance upon a section of its flood ordinance that had never before been used and was not used against any other property, including Arbor Court's neighboring complex that housed low-income residents and sat in the same floodplain and floodway as Arbor Court.

2

The City's regulatory action stripped Arbor Court of all economic use. As a result, DMAC was forced to bear on its own the entire weight of the City's flood management policy in the aftermath of Hurricane Harvey. Nevertheless, after a bench trial, the district court ruled that no taking occurred. The court's conclusion was driven by its view that denying a permit to protect health and safety under a valid flood ordinance all but precludes a finding that such permit denial, regardless of its severe impact, was a compensable taking. This was error. It is settled law that government regulation that deprives a property owner of all economic use is a *per se* taking—regardless of the reason for the regulation. Here, the City admitted DMAC can do nothing economically useful with the property, and the court agreed, yet ruled for the City anyway based on the metaphysical possibility that someday DMAC or someone else might be able to use the property in some unidentified way.

Even under *Penn Central's* more flexible analysis for less-than-total regulatory takings, the district court's holding was fatally flawed. No one disputes that government may act to fulfill a public purpose through the protection of public health and safety, but the Takings Clause requires just compensation to an owner when the impact of the government's regulatory decision "goes too far." A regulatory taking occurred here because the City's novel and unprecedented use of the flood ordinance against Arbor Court imposed a uniquely severe deprivation upon Arbor Court that

3

completely and permanently disrupted DMAC's reasonable investment-backed expectations and caused substantial economic harm.

The City was certainly free to conclude that Arbor Court's use should not continue, and it possessed the power to bring that policy into effect for a legitimate public purpose. The City could have taken the property through eminent domain or bought the property outright, as it repeatedly considered both before and after Hurricane Harvey. Or it could effectively take the property through regulation, as it did here. But the Takings Clause requires that just compensation be paid when there has been a "functional equivalent" of an affirmative taking. This Court should reverse the decision below and remand for a determination of just compensation and damages.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the claims arising under the Takings Clause under 28 U.S.C. § 1331.

On July 14, 2023, the district court entered a final judgment in favor of the City, ROA.6021, and DMAC timely filed a notice of appeal on August 10, 2023. ROA.6256. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether the permit denial constituted a categorical taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), because it destroyed all economically beneficial use of DMAC's property.

2.      Whether the permit denial constituted a taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), because it significantly reduced the value of DMAC's property, severely disrupted DMAC's investment-backed expectations, and functioned as the equivalent of a classic taking.

## STATEMENT OF THE CASE

**I.      Until these events, Arbor Court was a multi-family, affordable-housing apartment complex.**

For decades, Arbor Court was operated as a 15-building multi-family apartment community with 232 units located in the Greenspoint area of Houston, Texas. ROA.8685, 8698. With HUD's approval, DMAC purchased Arbor Court in January 2016 for $11.85 million. ROA.7168. Soon afterwards, DMAC invested an additional $1.4 million in improvements. *Id.* DMAC operated Arbor Court under a Housing Assistance Payment Contract ("HAP Contract") with HUD, under which HUD subsidizes rental rates for low-income residents. ROA.7170–71, 8687.

Arbor Court is located within a 100-year floodplain, ROA.7169, meaning that in any one year, there is a one percent chance of flooding. ROA.7646. In the 30 years

before DMAC's purchase in 2016, Arbor Court had not flooded once. ROA.6016, 6669, 7068. Nor were there any known regulatory violations. ROA.6682.

Enacted in 1985, Houston's flood ordinance is located at Chapter 19 of the Houston Code of Ordinances ("Flood Ordinance" or "Chapter 19"). ROA.8834. For buildings located in the floodplain a permit is needed from the City for any development activity, including significant repairs. ROA. 8842–43, 8844 (§§ 19-11, 19-16(a)). The Flood Ordinance charges the City Engineer with administering the Ordinance, including reviewing applications for development permits under certain criteria. ROA.8843 (§ 19-12). Under Section 19-19, "the city engineer may deny a permit application if the issuance of the permit could result in" one of five circumstances, including "[d]anger to life or property due to flooding or erosion damage in the vicinity of the site." ROA.8846 (§ 19-19(a)(1)). The City had never used Section 19-19 to deny a repair permit until this case. ROA.6016, 7684–85.

The Flood Ordinance requires that residential structures in the floodplain be elevated 12 inches above the level that floodwaters have been computed to reach during a 100-year flood. ROA.8851 (§ 19-33(a)(1)). However, these elevation standards apply only to "new construction" and "substantial improvement" of structures; existing structures like Arbor Court are grandfathered in and need not comply. ROA.6694, 8850–52 (§§ 19-32, 19-33). A "substantial improvement" "include[s] structures that have incurred . . . substantial damage, regardless of the repair work

6

performed." ROA.8841 (§ 19-2). "Substantial damage" occurs when "the cost of restoration of the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure." *Id.* (§ 19-2)*.* Thus, if a structure is damaged by 50% or more during a flood, its repairs must comply with the Flood Ordinance's heightened requirements for new construction.

## II.    The City promptly issues repair permits to DMAC after the 2016 Tax Day Flood and explores buying out Arbor Court as a high priority.

In April 2016, Houston experienced the so-called Tax Day Flood. ROA.5971. Like many other Houston buildings, Arbor Court's buildings suffered flood damage, with water up to four feet high in the first floor of each building. ROA.5971, 6016. DMAC promptly sought repair permits pursuant to the Flood Ordinance. ROA.7852–53. On April 27, 2016—less than two weeks after the Tax Day Flood— the City issued the repair permits. ROA.6757, 7852–53. DMAC promptly completed the repairs and reopened Arbor Court. ROA.6757. The City applauded DMAC for its efforts, and the City's own efforts, exclaiming "[y]ou all rock! Your profession-alism and compassion is unsurpassed." ROA.7851.

A few months later, HUD renewed the HAP Contract for an additional 20-year term and increased the subsidized rental payment. ROA.7171, 8755–78. DMAC then made additional improvements to Arbor Court. ROA.7180. To raise the needed capital, it refinanced its mortgage with Plains Capital Bank. ROA.7172–74, 7179–80. During that process, the bank appraised Arbor Court at $21,120,000. ROA.8483.

Following the Tax Day Flood, the North Houston District, a special purpose district in the City, ROA.6730, 6794, commissioned the engineering firm of Lockwood, Andrews & Newman, Inc. to prepare a report analyzing flooding in the area near Arbor Court ("LAN Report"). ROA.7647, 7874. The LAN Report made several recommendations, one of which was "the pursuit of the buyouts of repetitive and severe repetitive loss properties." ROA.7876. Although specific properties were not mentioned by name, the proposed buyout targets were understood to be Arbor Court and Biscayne at Cityview ("Biscayne"), a residential complex adjacent to Arbor Court. ROA.5972, 6684–85, 6719–20. The LAN Report recommended that if the City pursued buyouts, these two properties could be repurposed after demolishing the income producing improvements, turning the raw land into a multiuse park and water-detention site to mitigate against flood risk. ROA.6684–85, 6719–20, 7876–77.

After the LAN Report, the District began to lobby the City to carry out its recommendations, and on June 20, 2017, Robert Fiederlein, its Vice President of Strategic Planning and Development, emailed the City's Director of Public Works and the City's "Flood Czar" and recommended the "acquisition and demolition of Arbor Court Apartments," which "has been the focus of the Housing Director for some time," in order "to construct a local detention pond on the Arbor Court site." ROA.7946.

Tom McCasland, the City's Housing Director, agreed that the City should buy out or otherwise relocate Arbor Court. ROA.6821–24, 6885–86. But the City lacked the money to pay for it. ROA.6821, 6885 ("this was a hunt for money to execute on what we hoped would become one of our highest priorities"), 7860. Nonetheless, McCasland said, "[g]etting Arbor Court relocated should be one of our highest priorities, and ensuring sufficient funding for that in addition to any other recovery activities is key." ROA.6821, 7860.

## III. Arbor Court floods during Hurricane Harvey, and the City briefly intensifies its interest in purchasing Arbor Court.

When Hurricane Harvey struck Houston on August 25, 2017, Arbor Court's first-floor units were flooded with anywhere between six inches and four feet of water, much as during the Tax Day Flood. ROA.6016, 8688. Those units became uninhabitable, forcing residents to relocate. ROA.7404–05, 8454. However, there were no known injuries or deaths. ROA.6672.

Anticipating that DMAC would act promptly to repair Arbor Court, City officials and other interested parties immediately discussed in detail how the City should handle Arbor Court. On August 31, 2017, the District's Fiederlein emailed Andy Icken, the City's Chief Development Officer, providing Icken with maps showing Arbor Court's location in the floodplain and informing him that HUD had recently renewed its HAP Contract for 20 years. ROA.7949. Icken's response was two-fold. First, he replied to Fiederlein, cc'ing the City's Director of Public Works

and an employee of the City's Permitting Center, stating that he "would think that permits for any property that has repeatedly flooded and are in the flood way should be considered very carefully in the context of [Federal Emergency Management Agency ("FEMA")] regulations." ROA.9428. Second, Icken forwarded that email to Neal Rackleff. ROA.7954. Rackleff was an Assistant Secretary of HUD whom Icken knew from Rackleff's prior service as the City's Director of the Housing Department. ROA.5760–61, 5766, 6735, 6800–01. Referring to Arbor Court, Icken wrote, "This will boil your blood. It did mine. Shut him down. And find a way that buyouts of units like this can happen asap." ROA.6736, 7954.

On September 1, 2017, Fiederlein emailed Icken again. ROA.7950, 7952. He reminded Icken that the District had recommended buying out Arbor Court, ROA.7950, and informed Icken that DMAC planned to rebuild, ROA.7952. Fiederlein urged the City to pressure DMAC or HUD to "do something" regarding the HAP Contract or to consider condemnation. ROA.7952. Fiederlein acknowledged, however, that condemnation would be costly because of the valuable HAP Contract. *Id.*

City officials responded by continuing to lobby HUD. On September 12, 2017, McCasland emailed Rackleff "to request HUD's assistance with coordinating with the owner of Arbor Court . . . to ensure that the units are not rehabbed." ROA.6826, 6893, 7958. He said that it was "a priority for both [McCasland] and the Mayor that low-income families not be placed once again in the way of storm water

given that Arbor Court is in the floodway." ROA.6826, 6893, 7958.

HUD was not interested in collaborating with the City to stop Arbor Court's reopening. ROA.6860 (McCasland testifying that HUD did not oppose Arbor Court's rebuilding and return of residents). Rackleff instead informed McCasland and Icken that if the City wanted to move quickly with buying out Arbor Court, it may need to use other funds rather than waiting for disaster-relief funds for the 2016 and 2017 storms. ROA.7962. Rackleff asked them to confirm whether the City was ready to move forward with purchasing Arbor Court. ROA.7964–65. McCasland responded that the City awaited disaster-relief funds, but that if those funds could be expedited, buying out Arbor Court would be a priority for the City. ROA.7964.

In the months after Harvey, the City doubted that it had the fiscal means to buy out Arbor Court. *See* ROA.8061–80 (generally, the money was not available); ROA.6680 (Icken stating that post-Harvey the City lacked funding for a buyout); ROA.6738 (Icken stating that the Harvey disaster funds would be "not enough to make a transaction of any kind"); ROA.6847–48 (in Summer 2018, the City did not have disaster relief funds from either 2016 or 2017). Consequently, on September 18, 2017, Icken informed McCasland and Rackleff that the City was "carefully considering application of chapter 19 to repetitively flooding properties" and "[n]o permits will be issued until that review is complete." ROA.6762–65, 7964.

**IV.    DMAC submits repair permit applications, which undergo a lengthy administrative process.**

As the City discussed internally how to shut down Arbor Court, DMAC applied for repair permits on September 22, 2017. ROA.7984, 8860. Shortly thereafter, Icken requested an update on how the City would handle the permits for Arbor Court. ROA.8034. The City's Director of Public Works confirmed she was working with the Mayor on that question and stated (in an email expressly "re: Arbor Court"), that properties not substantially damaged would "force [the City] to have options or allow them to move ahead" with repairs. ROA.6767–69, 8034.

On October 4, 2017, Icken confirmed that he and the Mayor would not support a buyout of Arbor Court but would oppose rebuilding, claiming "[w]e are working with hud." ROA.6779–81, 8041. He also said that condemnation was not an option because "[the] City doesn't condemn properties." ROA.6780, 8041.

On October 6, 2017, the City informed DMAC that its repair permits had been denied. ROA.8043. The City claimed that all of Arbor Court's buildings were "substantially damaged" because repairs would cost more than 50% of the buildings' values, and therefore, pursuant to the Flood Ordinance, no permit could be granted until all 15 multi-family buildings were elevated at least 12 inches above the base flood elevation. ROA.8043, 8051–52. DMAC appealed the City's substantial-damage determination and permit denial, alleging that the buildings were collectively 20.46% damaged. ROA.8811. DMAC partially prevailed on appeal, as the City's

12

supervising engineer Choyce Morrow concluded that Buildings 7–9 and 12–15 were not substantially damaged. ROA.8083. The City concluded, however, that Buildings 1–6 and 10–11 were substantially damaged and thus would require elevation under the Flood Ordinance. ROA.8084–85.

DMAC appealed the latter finding. ROA.8090. Inspectors from the City's Flood Management Office conducted a field investigation of Arbor Court on April 23, 2018. ROA.8032. A few days later, on May 1, 2018, Morrow emailed Pat Casey, the City's Senior Assistant City Attorney, accidentally cc'ing Morgan Cox of DMAC. ROA.5980, 8092. Morrow stated that after reviewing the Flood Ordinance and Arbor Court's cost estimates, the damage to all of Arbor Court's buildings would be classified as non-substantial. ROA.8092. But two days later, Morrow emailed Cox, cc'ing Pat Casey, informing him that City inspectors found several items that were not included on DMAC's damage assessment and repair proposal. ROA.9453. Morrow requested revised cost estimates for the additional repairs needed. *Id.*

**V.    Unable to finalize a substantial damage determination, the City turns to a previously unused section of Chapter 19 to deny DMAC's permit applications.**

The City was unable to make a final determination on whether Arbor Court's buildings were substantially damaged. ROA.8231. Instead, on July 17, 2018, the City informed DMAC that it had denied the repair permit applications on a different ground: Section 19-19(a) of the Flood Ordinance. *Id.* Specifically, the City Engineer

"concluded that there is danger to both life and property due to flooding in the vicinity of the site." *Id.* In making that Section 19-19 determination, the letter pointed to the LAN Report, the property's location in the floodplain, and media photos of Arbor Court from the Tax Day Flood and Hurricane Harvey. ROA.8231–32.

The City had never used Section 19-19 until Arbor Court's permit denial. ROA.6016, 7684–85. In fact, the City Engineer had no guidance on how to make a Section 19-19 determination because no other properties had ever been subjected to that scrutiny. ROA.7685. As a result of this permit denial (under Section 19-19), DMAC could not make the requested repairs, and any use of the property would have to comply with the Flood Ordinance's elevation requirement. ROA.7690.

Before the Engineer's July 2018 decision, the City was still discussing the possibility of a buyout. On June 1, 2018, Harry Hayes, in his role as Chief Operating Officer in the Office of the Mayor, told McCasland, "You should crank up your role right now and not wait. Assume as of today that the residents will need to be relocated and we will purchase the property from the floodway." ROA.6857, 8220. Due diligence information was exchanged and on July 30, 2018, DMAC sent a proposed option contract. ROA.5988. The proposed buyout would have determined Arbor Court's value based on an agreed-upon appraisal methodology that included the HAP Contract and actual operating data as if the property was fully operational. ROA.6868–89. But the City had not received disaster-relief funds from either 2016

or 2017, and the City ultimately did not accept or counter the proposal. ROA.6847–48.[1]

## VI. The City's permit denial ended the use of Arbor Court as HUD-subsidized affordable housing.

Following Hurricane Harvey, Arbor Court operated at 50% of its capacity because the City refused to issue permits allowing for repairs to be made to the other 50% of the units. ROA.6792–93.

HUD had confirmed to the City during the summer of 2018 that if it purchased the property, it could operate the property during a transitional period and later control the disposition of the HAP Contract to another property through the Section 8bb transfer process. ROA.8234. When the City asked HUD to address what would happen if HUD were to terminate the contract, HUD explained that the City could use the Section 8bb transfer process as a housing preservation tool to transfer the contract to another property. ROA.8239. Additionally, for the first time, HUD expressed

---

[1] The City and Harris County Flood Control District eventually bought Biscayne—the apartment complex adjacent to Arbor Court—for about $32 million. ROA.6686. Biscayne was also a multi-family, multi-building affordable-housing complex that had been recommended for buyout in the LAN Report and sustained flood damage during Hurricane Harvey. ROA.5986, 6685, 7876. Unlike Arbor Court, Biscayne carried out its repairs without first applying for or receiving a permit—a violation of the Flood Ordinance. ROA.7685-86. Despite the City's knowledge of this violation, ROA.6721, Biscayne resumed full operations for roughly four years until it was purchased at full value. ROA.6829-31.

its concern about the physical condition of the property, confirming that if timing of a repair was not viable to HUD, termination of the contract would occur. ROA.8240.

With the awareness that if repairs were not made a termination would occur, the City withdrew from negotiations to purchase the property. ROA.6819, 6880–81. HUD promptly issued a default notice to DMAC dated October 18, 2018, with three required corrective actions needed to prevent a termination of the HAP Contract at Arbor Court. ROA.8246–47. Because those corrective actions were either dependent upon issuance of repair permits that the City would not issue, or a negotiated resolution between the City and DMAC that protected the interests of all residents that had ended, DMAC could not cure the default. ROA.7247, 7410.

Because the needed repairs could not be made due to the City's permit denial decision, the remaining tenants had to be moved out of Arbor Court, with the last one leaving in December 2019. ROA.7272. The property has since sat idle and unusable for any economically viable purpose. ROA.7001, 7011, 7615.

DMAC continues to own the property, incurring recurring operational expenses, including annual property tax liabilities, costs of security, and numerous other holding costs, with no ability to produce income to cover these ongoing expenses or to pay off the debt. ROA.7257–58, 7266–67.

## VII. The City's actions left Arbor Court with no remaining economically viable use.

At trial, DMAC's expert testified that "it wasn't economically feasible to redevelop the property, given the cost of demolition and the cost to comply with Chapter 19['s elevation and other requirements]." ROA.7001. He further testified that the property no longer had any economic use because "it's impossible to properly develop this property" due to costs related to demolition, site preparation, and construction. ROA.7011.

The City's expert agreed, testifying that the property's highest and best use after the permit denial was to "[h]old it for future development" "[u]ntil there is such a time that development becomes feasible." ROA.7614–15. When asked, he could not identify any point in time when redevelopment would be economically feasible. ROA.7615. He could not identify any present or future economic use of the property. ROA.7614–15. Instead, he testified that the value of the property was entirely the value of the underlying land. ROA.7615.

## VIII. DMAC files suit, and the district court renders judgment in favor of the City.

DMAC filed suit on June 8, 2018. ROA.32. Initially, the district court dismissed the action for lack of ripeness, but on appeal, this Court determined the matter had ripened during the pendency of the appeal and remanded it to the district court. *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215 (5th Cir. 2021). The case

proceeded to a bench trial on DMAC's claims that the City was liable for a regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), or *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), after a summary judgment ruling dismissing DMAC's other claims.

The district court entered Findings of Fact and Conclusions of Law. ROA.5967. The court began its analysis by explaining that whether "a permit is denied pursuant to a valid Flood Ordinance . . . is a relevant consideration" and "weighs strongly against finding that a permit denial is a taking." ROA.6005. "While the Court could envision a situation where denying a permit due to a flood ordinance would constitute a taking," it held that "such a situation would likely be quite rare and only occur in extreme cases where a city abused or improperly applied the ordinance." ROA.6005–06.

With this thumb on the scale, the court denied both claims. The court rejected the *Lucas* claim because although it identified no current productive use for the property, it believed that holding the property for possible future development or sale constitutes an economically beneficial use. ROA.6011. Applying *Penn Central*'s three-factor test, the court agreed on the first factor that DMAC incurred significant economic detriment due to the permit denial. ROA.6013–14. On the second factor, the court agreed that DMAC's investment-backed expectations were disrupted, but it blamed nature, not the City, for the disruption. ROA.6016. The court reasoned that

DMAC should have expected the City to utilize Section 19 of the Flood Ordinance to deny repair permits after Hurricane Harvey. ROA.6016–17. Finally, the district court found that because the City's rationale for the permit denial focused on health and safety, *Penn Central*'s "character of the government action" factor favored the City. ROA.6017–18. Judgment was entered on July 14, 2023, ROA.6021, and DMAC timely filed a notice of appeal on August 10, 2023, ROA.6256.

## SUMMARY OF ARGUMENT

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. While the traditional taking involves a direct appropriation of land by the government, the Supreme Court has long recognized that government regulation can effect a regulatory taking of private property. Under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), regulations that completely deprive property of all economically beneficial use constitute a categorical taking. Other regulatory takings challenges are governed by the standards set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), and turn on an ad hoc consideration of all relevant facts including: 1) the economic impact of the regulation on the claimant; 2) the extent to which the regulation has interfered with distinct investment-backed expectations; and 3) the character of the governmental action. As the district court held, a permit denial—even one pursuant to a flood ordinance—can effect a

regulatory taking. While the court wrongly emphasized the City's public purpose in denying the takings claim, its findings largely supported the conclusion that a taking occurred.

I.    The City's permit denial constituted a categorical taking under *Lucas*. Categorical treatment is appropriate where the regulation denies all economically beneficial or productive use of land. Here, the permit denial undisputedly deprived DMAC of all economically beneficial use of Arbor Court. The district court did not identify any present or future economically productive use that DMAC could make of the property. Both DMAC's and the City's witnesses testified that the property has no remaining economically beneficial use. And all agreed that it was not economically feasible to redevelop the property, given the costs of demolition and compliance with the Flood Ordinance.

The court nonetheless rejected DMAC's *Lucas* claim. It erroneously concluded that DMAC's ability to hold the property for future development or sale defeated its *Lucas* claim. But under *Lucas*, the key question is whether the property has an identifiable economically viable use, not merely the assumption that some unforeseen economic use may reveal itself at an unidentified point in the future. If the mere hypothetical possibility of a future use by the property owner or someone else is enough to constitute an economically beneficial use, then *Lucas* is a dead letter. Under the proper legal standard, the district court erred in rejecting DMAC's

*Lucas* claim where the record conclusively established—and the district court's own findings reflect—that Arbor Court had no economic use as a result of the City's Chapter 19 permit denial.

II.     The permit denial also constituted a taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). Once again, the district court's findings largely favored DMAC, but legal errors produced the wrong outcome. Under the district court's incorrect approach, denying a permit for health and safety reasons pursuant to a flood ordinance could never constitute a taking. That is not the law.

The district court correctly concluded that the first *Penn Central* factor—the economic impact of the regulation—favored DMAC because the loss in property value caused by the permit denial was significant.

On the second factor, the court agreed that DMAC's reasonable investment-backed expectations were disrupted. But the court erred in assigning blame for the disruption to the hurricane instead of the City's novel regulatory actions against DMAC (and only DMAC). DMAC acquired and invested in Arbor Court to operate it as a productive, income-earning residential complex. It did so successfully, including making repairs and reopening after the Tax Day Flood. HUD then reaffirmed DMAC's investment-backed expectations by granting a 20-year extension on its contract to provide affordable housing. When Hurricane Harvey struck, several

senior City officials initially contemplated ending Arbor Court's use via a purchase of the property or a permit denial under the Flood Ordinance. While nature may have provided the context in which the City ultimately acted with regard to Arbor Court and only Arbor Court, it was the City's denial of a permit and the impact of that denial, that caused the disruption of DMAC's reasonable expectations. The City's prior authorization of DMAC's post-flooding repairs, along with its lengthy consideration of buying out Arbor Court and its purchase of the neighboring Biscayne complex, show DMAC reasonably expected that the City would have either allowed repairs after Harvey or compensated it for ending the use of Arbor Court via a regulatory decision. Instead, the City invoked a flood regulation—never used before—to strip DMAC of its valuable right to use its property without the compensation the Constitution requires. DMAC could not have reasonably anticipated that such a novel and unprecedented regulatory action no less would disrupt and end DMAC's investment-backed expectations.

The third factor likewise favors DMAC because the character of the permit denial was the functional equivalent of a classic taking. The Supreme Court has explained that regulatory takings occur when one member of the public must sacrifice disproportionately for the public interest. It cannot be disputed that DMAC alone-suffered unique and singular treatment under Chapter 19, far beyond a mere adjustment of benefits and burdens for the public good. The City forced it to bear all of the

costs of the City's post-Harvey flood management policy so that the public could benefit. In concluding that this factor nonetheless favored the City, the district court reasoned that the City's permit denial was non-compensable because it sought to advance flood management and public health and safety. That is neither here nor there. The Supreme Court long ago removed considerations of purpose and rationale from the character inquiry. Whether the regulation serves a public purpose is logically prior to and distinct from whether a compensable taking has occurred, for the Takings Clause *presumes* that government acts for the benefit of the public health, safety, and welfare. Rather, the character inquiry focuses on the magnitude and severity of the burden imposed and how it is allocated across the public. Because DMAC alone bore the burden of a severe deprivation, all three *Penn Central* factors favor DMAC.

This Court should therefore reverse the district court's determination, hold that a taking occurred, and remand this case for a determination of just compensation and damages.

## STANDARD OF REVIEW

"On an appeal from a bench trial, [this Court] review[s] the district court's legal determinations de novo and its factual findings for clear error." *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court based

on all the evidence is left with the definitive and firm conviction that a mistake has been committed." *Houston Expl. Co. v. Halliburton Energy Services, Inc.*, 359 F.3d 777, 779 (5th Cir. 2004) (citation and internal quotation marks omitted). "However, factual findings made under an erroneous view of controlling legal principles are reviewed de novo." *Id.*

## ARGUMENT

**I.    As the district court recognized, the long-settled framework for regulatory takings applies to the City's actions.**

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). "Beginning with [*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)], however, the Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Id.* "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Mahon*, 260 U.S. at 415.

The Supreme Court has identified three categories of regulatory takings. First, and not relevant here, a direct physical taking occurs "where government requires

an owner to suffer a permanent physical invasion of her property." *Lingle*, 544 U.S. at 538.  Second, under the rule set out in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), "regulations that completely deprive an owner of all economically beneficial use of her property" likewise constitute a "categorical" taking. *Lingle*, 544 U.S. at 538 (cleaned up). Third, regulatory takings claims outside of the first two categories are governed by the standards set forth in *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104 (1978). This category "is characterized by essentially ad hoc, factual inquiries and designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (citations and internal quotation marks omitted). Although there is no "set formula" for this category, "the Court's decisions have identified several factors that have particular significance": 1) "[t]he economic impact of the regulation on the claimant"; 2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and 3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124. These three categories of regulatory takings "share a common touchstone" as "[e]ach aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. "Accordingly, each of these

tests focuses directly upon the severity of the burden that government imposes upon private property rights." *Id*.

It is well-settled that a permit denial can effect a regulatory taking under either *Lucas* or *Penn Central* theories. *See, e.g.*, *Cooley v. United States*, 324 F.3d 1297, 1305 (Fed. Cir. 2003) ("[T]he permit denial was a final decision of the agency, from which a claim for a permanent taking may spring."); *Res. Investments, Inc. v. United States*, 85 Fed. Cl. 447, 484 (2009) ("Because it is the permit denial that can effect a regulatory taking, this court must examine the effect of that denial on plaintiffs' property interests."). As the district court held, this is true even where the government acts pursuant to a flood regulation or ordinance. ROA.6005. On this point, the district court correctly distinguished the challenge in *Adolph v. Federal Emergency Management Agency of the United States*, 854 F.2d 732 (5th Cir. 1988), in which this Court rejected a takings claim that facially attacked a local flood ordinance based on FEMA regulations. ROA.6003–05.

However, the district court went astray when it suggested that a permit denial "pursuant to a valid Flood Ordinance . . .weighs strongly against finding that a permit denial is a taking." ROA.6005. The court reasoned that the flood-ordinance context would "significantly impact[]" the character and investment-backed expectations factors of *Penn Central. Id*. As a result, the district court believed that a taking in that context "would likely be quite rare and only occur in extreme cases" where a

city acted on "pretext[]" or "abused or improperly applied the ordinance." ROA.6005–06, 6018. No authority supports the district court's novel view that flood-based permit denials suffer from second-class status in Takings jurisprudence. A valid or even important public purpose cannot excuse the government from the constitutional mandate to pay "just compensation." *Lingle*, 544 U.S. at 542–43. As discussed more fully below, the district court's mistaken starting point contravenes Supreme Court precedent and infected much of its analysis.

## II.    The permit denial was a categorical taking under *Lucas*.

The undisputed evidence and the district court's own findings confirm that DMAC suffered a total taking of all economic use under *Lucas*. The district court reached an erroneous legal conclusion because it believed that the theoretical possibility of some future, unidentified use of the Arbor Court land by DMAC or someone else defeats a *Lucas* claim. That is not the law.

### A.    The City's own evidence and the district court's own findings establish that Arbor Court had no economically beneficial use after the City's permit denial.

In *Lucas*, the property owner bought two vacant beachfront lots to build single family homes, just like his neighbors had already done. 505 U.S. at 1008. However, after he made this purchase, the state legislature enacted the Beachfront Management Act. *Id.* at 1007. This new law designated his property as a "critical area" and precluded him from placing any buildings on it, homes included. *Id.*

The Supreme Court held that a regulation "requiring land to be left substantially in its natural state" "carr[ies] with [it] a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm." *Id.* at 1018. Consequently, when a regulation "denies all economically beneficial or productive use of land," and leaves the property "economically idle," it constitutes a categorical taking. *Id.* at 1015, 1019.

In a similar way, the City's denial of the remediation permit "denie[d] all economically beneficial or productive use of land" to DMAC. Both parties' expert real estate appraisers confirmed that the highest and best use for the property before the City's permit denial was its continued economic use as a HUD-subsidized rental property. ROA.7003, 7597–99. The district court agreed that this use was no longer possible. ROA.6011 ("It is true that the former use of the property as a multi-family HUD subsidized apartment complex was no longer possible.").

But that was not the only use precluded by the City's permit denial. Quite the contrary; the evidence confirmed that there was *no* economic use available. As the district court recounted, the City's own expert testified that after the permit denial "the highest and best use of the property *was to hold it for future development*." ROA.5998 (citing ROA.7614–15) (emphasis added). What is more, the City's expert could not identify any point in time when redevelopment would be economically feasible, ROA.7615, nor identify any present or future economic use of the property.

ROA.7614–15. In other words, the record conclusively showed that there was *no* economic use of the property. ROA.7615 (City's expert agreeing that "there was no identifiable economically feasible redevelopment for that property"). And there was no evidence to suggest that a use would somehow appear in the future.

In its four brief paragraphs of legal analysis on the *Lucas* claim, the district court did not identify any present or future economic use for the Arbor Court property. ROA.6011-12. Its own findings thus establish the validity of DMAC's *Lucas* claim under a proper understanding of that case. But multiple legal errors caused the district court to reject the *Lucas* claim despite the dispositive record evidence.

## B. The ability to hold property for an unknown future use does not defeat a *Lucas* claim.

The district court declared that "a property does not have to *immediately* have value to still have some economically beneficial use," ROA.6011, relying upon an out of context footnote in a 40-year-old Ninth Circuit opinion, which stated that "holding property for investment purposes can be a 'use' of property." *Id.* (quoting *MacLeod v. Santa Clara Cnty.*, 749 F.2d 541, 547 n.7 (9th Cir. 1984)). This statement apparently drove the court's conclusion, for in the very next sentence the court "[a]ppl[ied] this standard" to pronounce that "DMAC has failed to show that no economically beneficial use of the property remained." *Id.* The court then seemed to fault DMAC for failing to foresee a future economic use that was beyond the capabilities of both parties' experts to predict.

29

This was legal error for obvious reasons. Courts have consistently reasoned that guesswork without a viable and identifiable economic use is not a substitute for the concrete economic use that *Lucas* requires. In *Lost Tree Village Corp. v. United States*, 787 F.3d 1111 (Fed. Cir. 2015), for example, a permit denial rendered development impossible, but the property retained a residual value derived solely from non-economic uses. *Id.* at 1117. The court affirmed the *Lucas* claim because "[s]peculative land uses are not considered as part of a takings inquiry." *Id.*; *cf. United States v. 320.0 Acres of Land, More or Less in Monroe Cnty., State of Fla.*, 605 F.2d 762, 814 (5th Cir. 1979) ("just compensation cannot be predicated upon potential uses which are speculative and conjectural").

Nor does the Ninth Circuit opinion that the district court cited support its approach. For one thing, *MacLeod* predated *Lucas* and thus analyzed only a *Penn Central* claim. *MacLeod*, 749 F.2d at 547. More to the point, while *MacLeod* mentioned holding property for an investment, the property there had economic uses: "It is an undisputed fact that MacLeod was free to continue to raise cattle or to lease out the property for grazing lands." *Id.* No case rejects a *Lucas* claim where neither the government nor the district court identified an economic use for the property and the property owner proved there was none.

**C.    The theoretical possibility of selling the property does not defeat a *Lucas* claim.**

Next, the court suggested that "even if DMAC could not use the property," if a potential buyer "could then use it for an economically beneficial use, there has been no total taking." ROA.6012 (citing in that paragraph *Nekrilov v. City of Jersey City*, 45 F.4th 662 (3d Cir. 2022)). However, that principle does not apply to these facts. In *Lost Tree*, the Federal Circuit explained that "[t]ypical economic uses enable a landowner to derive benefits from land ownership rather than requiring a landowner to sell the affected parcel." 787 F.3d at 1117. The case cited by the district court confirms this conclusion. In *Nekrilov*, the regulation merely banned short-term rentals, leaving a plethora of remaining economic uses. 45 F.4th at 670–72. The Third Circuit noted that if the owner's financial circumstances prevented it from engaging in one of those alternate uses, it could sell the property to someone else who could deploy the property for an economic use. *Id.* at 671 & n.3. Only where "there are other underlying economic uses" may a court "consider the plaintiffs' ability to sell the properties in determining whether there has been a total taking." *Id.* at 671 n.3. But "[w]hen there are no underlying economic uses, it is unreasonable to define land *use* as including the sale of the land." *Lost Tree*, 787 F.3d at 1117; *accord Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1433 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999) ("where . . . government action relegates permissible uses of property to those consistent with leaving the property in its

natural state (e.g., nature preserve or public space), and no competitive market exists for the property without the possibility of development, a taking may have occurred") (internal citations omitted). Here, the evidence conclusively shows that there was no economically beneficial use after the City's permit denial—for DMAC or anyone else. Speculation about the possibility of sale—without concrete evidence of economic use—cannot defeat a *Lucas* claim.[2]

**D.    A factual finding that DMAC failed to rule out any economic use would be clearly erroneous.**

To the extent the district court factually found that DMAC failed to establish that the City's permit denial destroyed all economic uses, that finding is clearly erroneous. As noted, the district court identified no economically viable use for the Arbor Court property. Instead, the district court seemed to think the hypothetical possibility of a use defeats a *Lucas* claim. After noting that the permit denial formally ruled out only restoration of Arbor Court's buildings, the court declared that "[t]he City did not deny permits for any other use." ROA.6011. And the court stated that it was "persuaded by testimony from City officials explaining that an owner may use the property in any way that it chooses, as long as the use complied with

---

[2] Besides Arbor Court's absence of an economic use, overall development prospects were bleak. According to the City's expert, investor sentiment and market demand for properties in Arbor Court's neighborhood was "dampened" after Hurricane Harvey. ROA.7573–76.

the ordinance." *Id.*

All true so far as it goes: As a zoning matter, DMAC could employ the property for any use that complied with the Chapter 19 requirements for building elevation. But the evidence categorically established that in the marketplace, the land had no economically viable use because complying with the City's elevation requirements would be "prohibitively expensive" and "economically unfeasible." ROA.6853–56 (testimony of City's Housing Director McCasland). A City Housing Department official estimated that the cost of demolition and redevelopment would be close to $40 million, ROA.8073, while DMAC's principal Douglas Hickok—an experienced real-estate developer—put the amount at $46 million and noted that no market existed to justify such a project, ROA.7263.[3] Either number far exceeds the district court's and the parties' valuation of Arbor Court's value even with a HUD contract intact. ROA.5992–96.

That is why the City's expert admitted that the land had no economic use, ROA.7613–15, such that the best use of the land was to hold it (idle of any use or income production) "for future development." ROA.7615. Indeed, the City's expert conceded that the property's value was entirely derived from the value of the

---

[3] The court stated that it "did not hear testimony indicating that DMAC ever looked into any way to comply with health and safety." ROA.6011. But all agree that the only way for DMAC to "comply with health and safety" was to elevate the properties to comply with the Flood Ordinance, which was financially infeasible as a practical matter. ROA.7001, 7011, 7017.

underlying land, not some present or future economic use of the property. *Id.* (opining that "the value of the property in the after state is land value"). Thus, the land's only value derived from its "natural state," the very definition of a categorical taking. *Lucas*, 505 U.S. at 1018.[4]

DMAC's appraisal expert agreed. He stated that the permit denial resulted in the property having no economically beneficial use. ROA.7000–01, 7011; *see also* ROA.7267–68 (DMAC principal Hickok testifying "I do not see any possible economic use to the property, knowing the costs that are involved."). He further testified that "all beneficial use of the property" was lost, ROA.7001, and no "economically feasible use" of the property remained, ROA.7011. "[I]t's impossible to properly develop this property," *id.*, and "it [is not] economically feasible to redevelop the property, given the cost of demolition and the cost to comply with Chapter 19." ROA.7001; *see also* ROA.7011-12, 7016. Accordingly, the record conclusively rebuts any factual finding that "DMAC has failed to show that no economically beneficial use of the property remained." ROA. 6011.[5]

---

[4] Adding insult to injury, DMAC has continuing liability for taxes, insurance, and other expenses, all for a property that can earn no income. ROA.7257–58, 7266–67. DMAC is thus *worse off* than the property owner who must maintain his land in its natural state.

[5] After determining that the Arbor Court land was worth between $500,000 and $1 million after the permit denial, ROA.5998, the district court correctly did not rely on this alleged residual value to reject DMAC's *Lucas* claim. As the court recognized, "if the residual value is due to a non-economic use, a *Lucas* taking may nonetheless

\*     \*     \*

"[W]hen the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas*, 505 U.S. at 1019. The City's permit denial put a stop to Arbor Court's existing use, and no other economic use is possible under the City's Chapter 19 classification. Consequently, the evidence compels the determination that the City's permit denial was a categorical taking requiring the payment of just compensation to DMAC. DMAC was left with an economically idle and useless property, unable to earn any income and doomed to stagnate in its natural state for the foreseeable future. The City's action was "functionally equivalent to the classic taking in which government directly appropriates private property." *Lingle*, 544 U.S. at 539. On this ground alone, the Court may reverse and render judgment that a taking occurred.

---

have occurred." ROA.6009; *cf. Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (explaining that *Lucas* "was limited to the extraordinary circumstance when no productive or economically beneficial use of land is permitted" while "[a]nything less than a complete elimination of value" must be analyzed under *Penn Central*) (citations and internal quotation marks omitted); *Lost Tree*, 787 F.3d at 1116–17 (holding that *Lucas* takings occur "[w]hen there are no underlying economic uses," even if some residual value exists). Nor did the district court consider the value of the HAP Contract—a separate property interest from the Arbor Court land—in determining whether the land had been deprived of economic use under *Lucas*. ROA.6011; ROA.6000 n.12.

III.    **The permit denial also constituted a taking under *Penn Central*.**

The City's permit denial was also a regulatory taking under *Penn Central*. As the district court properly found, that denial caused significant economic detriment to DMAC. But the district court erroneously concluded that the other two factors—interference with investment-backed expectations and character of the government action—weighed in favor of the City. Those determinations are replete with legal error—chief among them, the district court's belief that a permit denial pursuant to a flood ordinance will rarely constitute a taking. Once those legal errors are excised from the court's analysis, all three factors favor DMAC. The City invoked a novel regulatory basis to deprive DMAC alone of the use of its property, all after recognizing internally that a buyout was the appropriate path for ending Arbor Court's use in the name of flood control. The City's action is an uncompensated—and thus unconstitutional—taking that "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (citation and internal quotation marks omitted).

A.    **DMAC suffered significant economic detriment from the permit denial.**

The district court correctly concluded that the first *Penn Central* factor—the economic impact of the regulation—favored DMAC. ROA.6013–14. As the district court explained, "[t]he loss of millions of dollars of property value, amounting to as

much as 80% of the land is significant." ROA.6013. The court "recognize[d] the significant economic detriment that DMAC endured as a result of the permit denial," and it accurately found that "this prong of the *Penn Central* analysis cuts in favor of a finding that a taking occurred." ROA.6013-14.

**B.    The permit denial significantly disrupted DMAC's reasonable investment-backed expectations.**

On the second factor, the district court agreed that DMAC's reasonable investment-backed expectations were disrupted. But it misidentified the cause of that disruption—in large part due to its extreme deference to police power and health-and-safety-motivated actions. Once disruption is properly attributed to the City's unanticipated and novel use of Section 19-19, this factor favors DMAC.

**1.    The district court found that DMAC's reasonable investment-backed expectations were disrupted, but wrongly blamed the hurricane instead of the City.**

Here, the investment-backed expectations inquiry is straightforward. Arbor Court was a productive, income-earning residential complex, regardless of its location in a floodway. DMAC purchased Arbor Court in January 2016 for $11.85 million, ROA.7168, invested an additional $1.4 million in improvements, *id.*, and operated Arbor Court as HUD-subsidized housing under the HAP Contract, ROA.7170–71. It had every expectation of continuing to use the property as an affordable housing complex. Indeed, after the Tax Day Flood, remediation permits were granted despite the fact that some of DMAC's buildings were substantially damaged.

ROA.9553, 9563. HUD even renewed the HAP Contract for a term of 20 years after the Tax Day Flood and increased the subsidized rental payment, ROA.7171, whereupon DMAC raised additional capital to make more investments in Arbor Court. ROA.7172–74, 7179-80. A bank simultaneously appraised Arbor Court at $21,120,000. ROA.8483. This lofty valuation of a floodway property, plus the objective evidence of long-term government and private investment even after the Tax Day Flood, belie any conclusion that DMAC should have anticipated that its property could have been wholly stripped of value if another flood occurred, especially without the compensation required by the Constitution. [6]

The district court agreed that "DMAC's investment-backed expectations were disrupted." ROA.6016. But it concluded that "nature, not the City, was the primary disruptor of those expectations." *Id*. In the Court's view, once the Tax Day Flood and Hurricane Harvey occurred, the City responded reasonably, and thus "the repetitive flooding events—not the city—disrupted DMAC's investment backed expectations." *Id*. "Put differently, if DMAC had known, at the time that it purchased Arbor Court, there would have been two such flood events in such a compressed time frame, it would not have been reasonable to expect the City to continue as

---

[6] The contract with HUD heightened DMAC's investment-backed expectations, for affordable housing is a public-private partnership that depends critically on private investment capital. If municipalities can take HUD-backed properties without compensation, few investors will be willing to participate in this vital partnership, thwarting an important federal interest.

though nothing had happened." ROA.6016–17.[7] The district court's conclusion is legally erroneous for at least three reasons.

> **2.    A property owner is not charged with anticipating unexpected events and all possible government responses.**

First, it is improper to require a property owner to expect what the district court characterized as totally unexpected. *Cienega Gardens v. United States*, 331 F.3d 1319, 1346 (Fed. Cir. 2003) (noting that this factor addresses what the property owner "should have anticipated"). The district court acknowledged that "when DMAC bought Arbor Court in 2016, it bought a property that had not flooded in 30 years," and "[i]t could not have known that DMAC would shortly flood twice in a sixteen-month period with three-to-four feet of water each time." ROA.6016. Yet even though the district court acknowledged that this factor examines reasonable expectations "at the time of the [property's] acquisition," ROA.6014 (citation and internal quotation marks omitted), it wrongly charged DMAC with knowledge that the property "had been repetitively flooded," ROA.6015—something that only happened much later. If an owner is charged with anticipating all events with a finite probability and all possible government responses to those unlikely events, then this factor is reduced to a rubber stamp for the government.

---

[7] DMAC, of course, does not contend that the City should have "continue[d] as though nothing had happened." ROA.6017. The relevant question is whether DMAC could reasonably have anticipated that the City would end Arbor Court's use under Chapter 19 without just compensation.

As fundamentally, most regulatory actions are a response to some circumstance not necessarily created by the property owner or government. Under the district court's approach, a governmental entity could evade being labeled the "disrupter" of investment-backed expectations simply by pointing to a public purpose in protecting the public health and safety, and this factor would never favor the property owner.

### 3.     The City's decision to deny a repair permit—not the hurricane—disrupted DMAC's reasonable investment-backed expectations.

Second, even assuming this *Penn Central* factor requires such clairvoyance by property owners, the district court still wrongly concluded that nature, not the City, was the disrupter of DMAC's expectations. Going back as far as the post-Tax Day Flood LAN Report and continuing after Hurricane Harvey, the City contemplated a buyout of Arbor Court if ending its existing, economically beneficial and permissible use was to occur. The LAN Report recommended purchasing the complex, ROA.7876, and McCasland agreed with a buyout, stating that "[g]etting Arbor Court relocated should be one of our highest priorities and ensuring sufficient funding for that in addition to any other recovery activities is key." ROA.7860. After Hurricane Harvey, the City showed renewed interest in purchasing Arbor Court. McCasland's email to Rackleff "to request HUD's assistance," ROA.7958, was an "attempt to find money" to be able to execute a buyout. ROA.6827. He made it clear

to Rackleff that if disaster-relief funds could be expedited, buying out Arbor Court would be a priority. ROA.7964.

But the City declined to pursue a buyout putatively because it lacked funds to do so.  ROA.5988–99 (lack of 2016 and 2017 disaster-relief funds was "significant" to City's consideration of buyout). As Icken testified, there were two ways to end Arbor Court's use—a purchase of the property or a permit denial under the Flood Ordinance—and the City apparently utilized the latter when the former was unavailable due to a lack of funds to meet its constitutional compensation obligations. ROA.6743–44. Thus, while nature may have provided the backdrop against which the City acted, the City decided how it would deal with Arbor Court, and the City chose the pathway that took DMAC's property without compensation. Accordingly, the City, not nature, permanently disrupted and indeed ended, DMAC's investment-backed expectations.[8]

---

[8] The district court found that the communications in the aftermath of Hurricane Harvey "did not impact on the permit denial at issue in this case," ROA.5974, because Icken and McCasland "had no role in or influence over the permitting process," ROA.5977. But DMAC does not contend, for purposes of appeal, that these communications show that the City's use of Chapter 19 was a pretext to avoid executing a buyout. Rather, the communications and testimony simply illuminate that the City deliberated on its approach to Arbor Court and what avenues were available to the City.

**4.    A reasonable property owner would have expected repair permits or compensation in these circumstances.**

Third, and relatedly, the reasonable investment-backed expectations of DMAC in continuing to use Arbor Court as affordable housing are reflected in the strong contemporaneous evidence that the City prioritized a buyout of Arbor Court in the aftermath of the Tax Day Flood and Hurricane Harvey. In other words, if DMAC did not have an established right to use Arbor Court that could not be taken without just compensation, then the City would not have endeavored to buy it. The City's buyout of the neighboring Biscayne complex further illustrates the traditional and expected method when government takes action that strips a repetitively flooded property of its economic use: monetary compensation.[9]

DMAC's reasonable expectation was consistent with the Constitution. The Supreme Court has recognized that an owner has a reasonable expectation that the government will not deprive property of all economic use. *Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015) ("*Lucas* recognized that while an owner of personal property 'ought to be aware of the possibility that new regulation might even render his

---

[9] While the district court noted why it believed Biscayne may have ultimately received a buyout when Arbor Court did not, *see* ROA.5986–87 (noting that Biscayne was not HUD-subsidized and made repairs without applying for a permit), these reasons do not negate the undisputed fact that Biscayne received full compensation for its repetitively flooded property, providing confirmatory evidence of what an investor in floodway apartment complexes could reasonably have expected when the City sought to protect public health and safety.

property economically worthless,' such an 'implied limitation' was not reasonable in the case of land.") (citation omitted). "[T]he historical compact recorded in the Takings Clause that has become part of our constitutional culture" recognizes that when government impairs the use of a property, just compensation will be paid. *Lucas*, 505 U.S. at 1028. DMAC therefore reasonably relied on the constitutional assurance that "[m]arketplace decisions should be made under the working assumption that the Government will neither prejudice private citizens, unfairly shifting the burden of a public good onto a few people, nor act arbitrarily or capriciously, that is, will not act to disappoint reasonable investment-backed expectations." *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1571 (Fed. Cir. 1994).

Thus, even though the City may have had the authority to end Arbor Court's use for the public good, DMAC could not have reasonably expected the City to take that course without payment of just compensation. Moreover, Houston is famous for its lack of zoning, broadly allowing land use with little regulation. ROA.8717. Houston's Flood Ordinance, according to Icken, does not target uses of property. ROA.6671–72. Though Houston has dealt with disastrous flooding for decades, Section 19-19 was not an established path for denying repair permits to end the use of a property.[10] Indeed, the district court recognized that "the City had not *ever*

---

[10] In the four decades since enactment of the Flood Ordinance, Houston has experienced numerous catastrophic storms and floods that have resulted in vast amounts

previously relied on the section of the Flood Ordinance that allowed it to deny repair permits when there is a danger to life or property." ROA.6016 (emphasis added); *see also* ROA.7684–85.

Consequently, DMAC could not have reasonably foreseen that the City would turn to a never-before-used section of the Flood Ordinance to destroy Arbor Court's value. As the Eleventh Circuit has held, "[i]nterference with investment-backed expectations occurs when an inadequate history of similar government regulation exists: where the earlier regulation does not provide companies with sufficient notice that they may be subject to the new or additional regulation." *Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1432 (11th Cir. 1998), *abrogated on other grounds by S. Grande View Dev. Co., Inc. v. City of Alabaster, Alabama*, 1 F.4th 1299, 1310 (11th Cir. 2021). That legal rule should have been applied with full force here given Chapter 19's nonexistent history of permit denials in any instance, other than the current one.

The district court responded only that "[i]t is reasonable that the City would use new tools in response to a disaster of this magnitude." ROA.6016. Yet, by definition, the use of a new tool disrupts current expectations. Moreover, the relevant legal question is not whether the government's use of "new tools" was "reasonable"

---

of property damage. Harris County Flood Control District, *Harris County's Flooding History*, https://www.hcfcd.org/About/Harris-Countys-Flooding-History (providing timeline detailing major storms since 1900).

in some general sense but whether the property owner "should have anticipated" an uncompensated regulatory taking under Chapter 19. *Cienega Gardens*, 331 F.3d at 1346. Once again, the district court's rule would lead to sweeping and troubling results. The government could take property without compensation so long it could point to a "disaster" that justified the use of "new tools." This would make a mockery of a factor that looks to reasonable expectations.

The City pursued a novel, unprecedented regulatory path, and it did so against only one property owner, all in the context of buyout discussions that highlighted the ordinary course. In doing so, the City disrupted DMAC's massive investment in a way that DMAC, or any other market participant, could not have reasonably anticipated when it purchased Arbor Court. The City may have needed to act in the wake of Hurricane Harvey, but the Takings Clause requires just compensation for responses that property owners could have not have reasonably anticipated.

### C. The character of the permit denial was the functional equivalent of a classic taking.

The district court also erred on the third *Penn Central* factor. By holding that the City's public purpose for the permit denial—protecting the public health and safety—resolved this factor in the City's favor, the district court applied the wrong legal test.

#### 1.     This factor examines the severity of the burden imposed and how that burden is allocated across the public.

"In considering the third factor, the character of the governmental action, regulatory takings doctrine seeks to identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain." *Clayland Farm Enterprises, LLC v. Talbot Cnty., Maryland*, 987 F.3d 346, 355 (4th Cir. 2021) (cleaned up). Thus, "the 'character of the government action' is another way to examine the severity of the government interference with property rights." *S. Grande View Dev. Co.*, 1 F.4th at 1311. In some circumstances, character alone can substantiate a *Penn Central* taking. *See Hodel* v. *Irving*, 481 U.S. 704, 716–17 (1987) (finding a taking based on character when all other factors weighed in the government's favor). Therefore, *"*instead of looking at the rationality of the regulation, we must consider 'the actual burden imposed on property rights, or how that burden is allocated.'*" Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1278 (Fed. Cir. 2009) (quoting *Lingle*, 544 U.S. at 543). For example, "are there direct compensating benefits accruing to the property, and others similarly situated, flowing from the regulatory environment? Or are benefits, if any, general and widely shared through the community and the society, while the costs are focused on a few?" *Florida Rock*, 18 F.3d at 1571.

The Supreme Court in *Lingle* held that a takings claim must focus exclusively on the severity of the government intrusion and not the purpose of that intrusion. 544

U.S. at 542-43. This is because "an inquiry [into the purpose of a regulation] is log-ically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose." *Id*. at 543. Courts have recognized that *Lingle* abrogated caselaw that allowed inquiry into the purpose or rationale behind a regulation. *See S. Grande View Dev. Co.*, 1 F.4th at 1311–12 (Because "*Lingle* changed the type of inquiry permitted in a just compensation claim, and abrogated our earlier precedent permitting an inquiry into the rationale behind the regulation," the fact finder must not consider "whether the city's action was reasonably necessary to the effectuation of a substantial public purpose.") (citation and internal quotation marks omitted).

## 2. DMAC alone bore enormous burdens for the public interest and received no benefits.

Under the proper legal test, the City's actions were the functional equivalent of a classic taking. The City's permit denial ended DMAC's beneficial use and in-flicted a singular and unique treatment on Arbor Court through its unprecedented and novel use of the Flood Ordinance. As already noted, the district court acknowl-edged that the City had never before applied Section 19-19 to deny repair permits. ROA.6016. The City asked Arbor Court to bear all of the costs of the City's new and novel post-Hurricane Harvey regulatory policy for flood management without any corresponding benefit. This goes far beyond a routine adjustment of the benefits and burdens of economic life and therefore weighs heavily in favor of finding a

regulatory taking. *See Cienega Gardens v. United States*, 503 F.3d 1266, 1283 (Fed. Cir. 2007) ("The Supreme Court in *Penn Central* clearly held that offsetting benefits must be accounted for as part of the takings analysis itself."); *cf. Clayland Farm Enterprises*, 987 F.3d at 355 ("[i]nterference with property is less likely to be considered a taking when it arises from some public program adjusting the benefits and burdens of economic life to promote the common good") (citation and internal quotation marks omitted).

Thus, the City's actions are far afield from a zoning regulation that broadly benefits property owners by imposing various use restrictions on most properties. *See Florida Rock*, 18 F.3d at 1570 (explaining that "reciprocity of advantage" for the aggrieved property owner, "paradigmatically in a zoning case," shows that the government was merely "adjusting the benefits and burdens of economic life to promote the common good") (citation and internal quotation marks omitted).

Notably, the City imposed no such burdens on the neighboring Biscayne complex, nor did the City ask any others to shoulder the burdens of its new policies. *See Rose Acre Farms*, 559 F.3d at 1278 ("regulations did not single out [plaintiff]" because "the enacted rules broadly applied to almost any egg producer in the United States"). The City therefore extinguished all the benefits DMAC received from Arbor Court and placed a unique burden on DMAC so that others could benefit. When government "disproportionately" burdens "a few private property owners" to

benefit the public—especially where the government could have caused "all taxpayers to shoulder the burden"—the character factor supports the property owner. *Cienega Gardens*, 331 F.3d at 1338–39.

Indeed, the City's imposing the full weight of its flood policy onto Arbor Court strikes at the heart of the Takings Clause's purpose. "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *see also San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 656 (1981) (Brennan, J., dissenting) ("When one person is asked to assume more than a fair share of the public burden, the payment of just compensation operates to redistribute that economic cost from the individual to the public at large. . . . [I]t is only fair that the public bear the cost of benefits received[.]").

### 3.    The district court legally erred by focusing on the City's purpose and rationale for its actions.

The district court nevertheless concluded that this factor favored the City because "the City's permit denial" was not "pretextual" and "was properly focused on health and safety." ROA.6017–18. The court started off on the wrong foot by quoting a pre-*Lingle* case holding that the character factor "requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition."

ROA.6017 (quoting *Maritrans Inc. v. United States*, 342 F.3d 1344, 1356 (Fed. Cir. 2003)). With little analysis, the court concluded that "[b]ecause the character of the government action related to flood management and was to ensure health and safety, this prong of the analysis strongly undercuts any argument that a taking occurred." ROA.6018.

Because the district court viewed this factor through the lens of the government's public purpose—rather than the severity and allocation of economic burdens—it applied a legally erroneous test. The Supreme Court has long since excised considerations of purpose and rationale from the character inquiry. After all, it is presumed that all takings are done for a public purpose. *See* U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation"). To preclude just compensation solely because a valid public purpose exists would eviscerate the Takings Clause. *Lingle*, 544 U.S. at 543. Thus, the *Lingle* Court explicitly abrogated the "substantially advances" formula of *Agins v. City of Tiburon*, 447 U.S. 255 (1980). *Lingle*, 544 U.S. at 542–43. It explained that the *Agins* formula "suggests a means-ends test: It asks, in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose." *Id.* at 542. But it "reveals nothing about the *magnitude or character of the burden* a particular regulation imposes upon private property rights. Nor does it provide any information about how any regulatory burden is *distributed* among property owners." *Id.* "In consequence,

this test does not help to identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property; it is tethered neither to the text of the Takings Clause nor to the basic justification for allowing regulatory actions to be challenged under the Clause." *Id.*

The district court ran afoul of the Supreme Court's guidance by focusing on purpose while ignoring the severity and distribution of burdens. The Federal Circuit reversed a trial court that made an identical error in rejecting a takings claim:

> The [trial] court's conclusion ignores the fact that this is not a case in which the burden for remedying a societal problem has been imposed on all of society. Congress' *purpose* in enacting the statutes may have been entirely legitimate but the government has not shown that the *actions* Congress took—the enactment of ELIHPA and LIHPRHA—were within its powers to exercise without also granting compensation. *The disproportionate imposition on the Owners of the public's burden of providing low-income housing is not rendered any more acceptable by worthiness of purpose.* The principles, as used by the trial court in this context, misconstrue what type of government action counts as a compensable taking by focusing on the purpose rather than the nature of the action.

*Cienega Gardens*, 331 F.3d at 1340 (emphasis added). This Court should likewise reverse the district court's legal error and resolve the third *Penn Central* factor against the City. Under the proper legal test, the undisputed evidence shows that the City's actions resembled a classic taking that inflicted severe harm on a lone property owner without any corresponding benefit to that owner. While the City may stop Arbor Court's use if it believes that will serve the public good, the Fifth

Amendment requires the City to spread the costs of that action across all taxpayers by providing just compensation to DMAC.

*    *    *

In sum, the City's permit denial caused DMAC significant economic detriment, disrupted DMAC's investment-backed expectations, and functioned equivalently to a direct appropriation of land. The City's actions were therefore a taking under *Penn Central*.

## IV.    This Court should remand for a determination of just compensation.

This Court should reverse the district court's judgment, hold that a taking occurred, and remand this case to the lower court for a determination of just compensation and damages. The district court's determinations of value were for liability purposes only, and they did not conform to what just compensation and damages determinations would require. For example, the district court did not precisely determine the value of Arbor Court, before or after, but rather calculated a wide range of values, which sufficed for a determination of liability but not just compensation or damages. ROA.5992–6001. Therefore, DMAC submits that any remand to the lower court include an instruction that just compensation and damages be determined *de novo*.

## CONCLUSION

For the foregoing reasons, DMAC respectfully requests that this Court reverse the grant of judgment in favor of the City, grant judgment in favor of DMAC, and remand for a determination of just compensation and damages.

Dated:  November 22, 2023.                    Respectfully submitted,

   */s/ Jonathan M. Houghton*
Jonathan M. Houghton
Christopher M. Kieser
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Ste. 1000
Arlington, VA 22201
Tel: (916) 419-7111

Aaron M. Streett
Christopher E. Tutunjian
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel: (713) 229-1234

Kenneth B. Chaiken
CHAIKEN & CHAIKEN, P.C.
5717 Legacy Drive, Suite 250
Plano, TX 75024-4246
Tel: (214) 265-0250

*Counsel for Plaintiff-Appellant*
*DM Arbor Court, Ltd.*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,675 words, including the portions of other briefs incorporated by reference and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman font, size 14.

Dated:  November 22, 2023.                     */s/ Jonathan M. Houghton*

*Counsel for Plaintiff-Appellant*
*DM Arbor Court, Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will send notice of such filing to all registered users.

Dated:  November 22, 2023.                    */s/ Jonathan M. Houghton*

*Counsel for Plaintiff-Appellant*
*DM Arbor Court, Ltd.*